IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MANDY JEANNE PODVOREC,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>NANCY A. BERRYHILL,  )<br>)<br>Defendant.  ) | No. 2:17-cv-00137-RCM<br><br>Magistrate Judge Robert C. Mitchell<br><br>Docket Nos. 14 & 19 |

**MEMORANDUM OPINION**[1]

**I.  Introduction**

Mandy Podvorec ("Plaintiff") brings this action against Nancy A. Berryhill ("Commissioner"), the acting commissioner of the Social Security Administration ("SSA"). Plaintiff argues that she was improperly determined to not be disabled by the Commissioner because an administrative law judge ("ALJ") gave too little weight to the medical opinions of Plaintiff's treating orthopedic physician when determining Plaintiff's residual functional capacity ("RFC"). The Commissioner claims the medical opinions of Plaintiff's treating orthopedic physician were contrary to Plaintiff's medical record and even contradicted themselves, justifying the ALJ's decision to give little weight to them.

Plaintiff and the Commissioner both moved for summary judgment. (Docket Nos. 14, 19.) After considering the parties' briefs, Plaintiff's medical record, and applicable law, the Court will: deny Plaintiff's motion for summary judgment (Docket No. 14); grant the Commissioner's motion for summary judgment (Docket No. 19); and affirm the Commissioner's finding that Plaintiff is not disabled. (R. 1, 22.)

---

[1] The parties fully consented to proceed before the undersigned. (Docket No. 12.)

## II.  Review of Record and Legal Standards

Plaintiff protectively filed for Disability Insurance Benefits ("DIB") on April 21, 2014, under Sections 216(i) and 223(d) of the Social Security Act ("Act"). (R. 22.) She alleged that her disability began on July 30, 2011. (R. 13.) Plaintiff's earnings record demonstrated that she acquired "sufficient quarters of coverage to remain insured through December 31, 2012" via the DIB program. (R. 13.) To receive DIB, Plaintiff must show she was disabled on or before December 31, 2012 (the date last insured). (R. 13.)

Plaintiff's DIB application was initially denied in late May 2014. (R. 90.) She next requested a hearing, which occurred on May 27, 2015 before ALJ Kathleen McBride. (R. 95, 115, 119.) Plaintiff, her attorney, and impartial vocational expert Dr. Fred Monaco ("VE") attended the hearing. (R. 29–30.) The ALJ held that Plaintiff was not disabled. (R. 13.) Plaintiff asked the SSA Appeals Council to review the ALJ's decision; the Appeals Council denied Plaintiff's request on December 6, 2016, making the ALJ's decision the Commissioner's final ruling on Plaintiff's DIB claim. (R. 1, 8–9.) Plaintiff sought judicial review of the Commissioner's final ruling at the end of January 2017 by bringing this action pursuant to 42 U.S.C. § 405(g). (Docket No. 1-1.)

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner that Plaintiff did not sustain her burden of demonstrating that she was disabled within the meaning of the Act. Richardson v. Perales, 402 U.S. 389 (1971); Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994).

42 U.S.C. § 405(g) provides that:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

> with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).

Because Plaintiff and the Commissioner did not discuss mental-health issues in their briefs (Docket Nos. 15, 20), the Court will not refer to them here.

Plaintiff discussed her physical ailments at her administrative hearing. She had surgery on her neck (cervical spine) in September 2011, her left shoulder in February 2012, and was involved in a car accident in May 2012, shortly before she was about to rejoin the workforce. (R. 38–39.) Plaintiff admitted that her cervical fusion surgery reduced her pain because she "was in horrible pain" before. (R. 42.) While some pain "wore on," she rated her post-surgery neck pain as a two or three out of ten on the pain scale. (R. 42, 51.) She also suffered from two to three headaches per week following her neck surgery; she rated her headaches as a three out of ten. (R. 50–51.) Plaintiff testified that she had limited mobility in her neck after surgery. (R. 43.) She also received relief after her left shoulder arthroscopy, claiming that the pain reduced to a three out of ten and later decreased further, saying "[m]y left shoulder is good now." (R. 45.) After her late May 2012 car accident, she claimed her neck pain could go up to a nine out of ten. (R. 54.) She also claimed that pain interfered with her sleep such that she does not "know what regular sleep is." (R. 55.) As for focus and concentration, she "can't get anything done." (R. 57.) Her complaints of low back pain increased after her May 2012 car accident, though the pain was a four out of ten when she took her Vicodin. (R. 47.)

3

Just before her May 2012 car accident, Plaintiff typically performed household chores like cleaning, doing dishes, doing laundry, cooking, buying groceries, and caring for her ill husband. (R. 48–49.) She was unable to carry laundry hampers over her head; she kicked them down the stairs instead. (R. 51–52.) While she used to scrub the floors daily, after her neck surgery, the floors are "lucky if they get scrubbed once every two weeks." (R. 52.) Reading from a book or a computer screen is difficult because pain constrains her neck movement. (R. 52.)

Once Plaintiff's testimony ended, the ALJ focused on whether Plaintiff could perform her past relevant work or any other jobs in the national economy. Plaintiff served as a private-duty licensed practical nurse, a semi-skilled, medium-exertion job, in four of her past positions. (R. 63.) She also worked as a practical nurse for a vocational school, a semi-skilled job with heavy exertion. (R. 63.) The ALJ then asked the VE to answer the following hypothetical question:

> assume a hypothetical individual of the claimant's age, education, and past work experience who is limited to light work . . . except with occasional overhead reaching with the left non-dominant upper extremity; frequent reaching overhead with the right upper extremity; frequent bilateral reaching in other directions; also frequent handling, fingering, and feeling.
>
> The individual can occasionally stoop, kneel, crouch, and climb ramps and stairs but never crawl or climb ladders, ropes, or scaffolds.
>
> The individual should have no exposure to unprotected heights, unprotected moving mechanical parts and no concentrated exposure to extreme cold or vibration.
>
> And, finally, the individual is able to perform simple, routine tasks with few, if any, work place changes, meaning the same duties are performed at the same station or location from day to day.
>
> Could this hypothetical individual perform any of . . . [Plaintiff's] past work that you described?

4

(R. 63.) "[N]o," replied the VE. (R. 63.) However, the VE confirmed that the hypothetical individual could work as a laundry folder, photocopy machine operator, or laundry sorter. (R. 64.)

The ALJ then asked the VE to assume the same limitations posed in the first hypothetical question except that the hypothetical person could only perform sedentary work. (R. 65.) The VE told the ALJ that such a person could not perform Plaintiff's past positions but could work as a document preparer, table worker, or surveillance-system monitor. (R. 65.)

Again focusing on her original hypothetical, the ALJ asked the VE to assume the hypothetical's original parameters while permitting "the individual . . . to sit for 1 to 5 minutes after standing or walking an hour and stand for 1 to 5 minutes after sitting an hour, assuming [the individual] . . . would remain on task regardless of posture." (R. 65.) The VE responded that the ALJ's added sit-stand option would not change his answer to the first hypothetical because the laundry folder, photocopy machine operator, and laundry sorter jobs allow an employee to "sit or stand at will." (R. 64–65.) The ALJ also asked whether a hypothetical worker off task twenty percent of the work day and absent more than once per month could hold a job; the ALJ responded that "both of those factors, separately and especially together, are preclusive of any work that I'm aware of." (R. 66.)

Finally, the ALJ asked the VE if adding a sit-stand option to the sedentary positions the VE identified in response to the ALJ's second hypothetical would change the VE's answer to that question. (R. 66–67.) The VE answered that his answer to that question would not change. (R. 67.) The VE also highlighted that his testimony was consistent with the Dictionary of Vocational Titles ("Dictionary"). (R. 66.) While the Dictionary does not describe a sit-stand option, the VE confirmed its existence based on his practical experience witnessing "jobs where

5

you could sit or stand at will" and developing job curricula that included sit-stand options. (R. 66.)

The issue before the Court is whether there is substantial evidence supporting the Commissioner's finding that Plaintiff is not disabled. The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(2)(A) provides the requirements for a disability determination:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would he hired if he applied for work. For purposes of the preceding sentence . . . "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). These provisions are also applied for purposes of establishing a period of disability. 42 U.S.C. § 416(i)(2)(A). While some regard these provisions as "very harsh," the courts must follow them. NLRB v. Staiman Bros., 466 F.2d 564 (3d Cir. 1972); Choratch v. Finch, 438 F.2d 342 (3d Cir. 1971); Woods v. Finch, 428 F.2d 469 (3d Cir. 1970).

Pertinent to this Court's ruling are Plaintiff's medical records dating from her alleged disability onset date of July 30, 2011 through December 31, 2012, which was Plaintiff's "date last insured" through the DIB program. (R. 13.) An August 24, 2011 MRI showed Plaintiff had a mild C5–C6 disc bulge and a minimal bulge at C6–C7. (R. 495–96.) Dr. Wecht, a neurosurgeon, diagnosed Plaintiff with a C5–C6 herniated disk with intractable neck, shoulder, and upper extremity pain. (R. 261–63.) To treat these issues, Dr. Wecht performed a C5–C6 discectomy on September 23, 2011. (R. 261.) Dr. Wecht informed Plaintiff's primary care physician, Dr. McCann, about two months after Plaintiff's discectomy that an x-ray showed her cervical spine was well aligned and her cervical disk fusion was progressing. (R. 523.) At the end of November 2011, Dr. Wecht reviewed additional x-rays of Plaintiff's cervical spine, called them "excellent," and advised Plaintiff to "gradually return to all normal activities without restriction." (R. 519.)

Emergency room records from May 27, 2012 indicate that Plaintiff was in a car accident the day before. (R. 543.) Plaintiff reported four out of ten pain and general tenderness in the areas of her back and neck surrounding her spine; her low back was mildly tender with a decreased range of motion. (R. 543.) Images of Plaintiff's cervical spine taken on May 31, 2012 show an "[u]ncomplicated anterior fixation C5–C6" with "[n]o acute fracture or subluxation." (R. 719.) More images demonstrated mild degenerative changes to the L3–L4 region of the lumbar spine (July 12, 2012) and a small disc bulge at C6–C7 (July 16, 2012). (R. 486, 488.) A lumbar spine MRI performed on July 25, 2012 revealed minor degenerative changes found in two locations: L3–L4 (left foraminal protrusion and mild left neuroforaminal narrowing) and L4–L5 (minor bulge with mild bilateral neuroforaminal narrowing). (R. 712–13.) On August 29, 2012, Dr. Wecht reported to Dr. McCann that Plaintiff's May 31, 2012 cervical and lumbar

7

MRI showed no structural instability, canal compromise, or nerve root compromise. (R. 512.) Dr. Wecht also related his observations of Plaintiff at that time: she showed five out of five motor strength in all major muscle groups with good tone and bulk, "grossly intact sensory," steady gait, and symmetric reflexes. (R. 512.) In response to Plaintiff's complaints of neck and back pain, Dr. Wecht recommended that she exhaust conservative treatment strategies with an emphasis on core strengthening, upper-body strengthening, home exercise, and a nutritious diet to shed "fat weight." (R. 512.)

From June 2012 through November 2012, Plaintiff met with her orthopedist, Dr. Sotos, several times. (R. 585–98.) Dr. Sotos noted that Plaintiff had some range-of-motion limitations due to pain radiating from her neck and lower back with moderate pain sometimes reported. (R. 585–98.) Dr. Sotos often advised Plaintiff to stay off work. (R. 585–98.)

Shifting focus to Plaintiff's left shoulder, at December 16, 2011 and January 10, 2012 appointments, Dr. Sotos diagnosed her with left shoulder impingement and bursitis and observed that her overall pain was moderate. (R. 603–04.) Plaintiff then sought a second opinion from Dr. Goitz, an orthopedic surgeon, who performed surgery on her left shoulder on February 28, 2012. (R. 244.) Dr. Goitz also performed a bursectomy that day. (R. 244–45.) During an appointment with Dr. Goitz six-weeks after Plaintiff's left shoulder surgery, she complained that her post-operative physical therapy caused four out of ten pain in her left shoulder. (R. 272.) This was an improvement from her nine out of ten pre-operative left shoulder pain. (R. 272.) Dr. Goitz measured Plaintiff's rotator-cuff strength as a four plus out of five. (R. 272.) He described Plaintiff's physical-therapy-induced shoulder pain as a "small setback," prescribed Flexeril to relax Plaintiff's muscles, and advised that she continue her physical therapy. (R. 273.)

Plaintiff also dealt with pain in her right foot. Her podiatrist, Dr. Marty, diagnosed her on October 31, 2011 with a heel spur, tenosynovitis, subtalar joint arthopathy, and general foot pain. (R. 269.) He performed a trigger-point injection to treat those issues. (R. 269.) Plaintiff received an injection in her right subtalar joint from Dr. McFeaters on February 16, 2012. (R. 268.) With her foot issues continuing, Dr. Marty again evaluated Plaintiff on March 8, 2012. (R. 267.) He diagnosed her with a right ankle sprain and left foot synovitis and capsulitis. (R. 267.) Dr. Marty applied a trigger-point injection to Plaintiff's right ankle and provided her with an ankle arch support. (R. 267.)

Dr. Sotos provided two medical opinions on Plaintiff's ability to work. His first opinion, dated January 5, 2015, evaluated Plaintiff's ability to work as of December 2012. (R. 971–72.) He diagnosed her with lumbosacral disc degeneration and sciatica. (R. 971.) Without listing symptoms, his opinion was that Plaintiff could, during an eight-hour work day, stand or walk for less than an hour and sit for less than an hour. (R. 971.) She could repeatedly lift between zero and five pounds. (R. 971.) She also could never reach overhead with either arm, reach in "all other" ways with either arm, handle with either hand, finger with either hand, or push and pull with either arm. (R. 971.) During an eight-hour day, she could never bend, squat, crawl, or climb. (R. 972.) He did not mark whether Plaintiff needed extra breaks or state the number of "bad days" she suffered from heightened symptoms. (R. 972.) Dr. Sotos alleged that Plaintiff's limitations continue to the present time and further stated that she is "currently and permanently disabled." (R. 972.) He did not provide any supporting reasons for his conclusion on this checkbox-type form. (R. 971–72.)

Dr. Sotos drafted a second medical opinion of Plaintiff's ability to work on April 27, 2015. (R. 1014–15.) He dated this opinion back to August 2011. (R. 1014–15.) His diagnoses

greatly increased in number, as he listed cervical DDD with radiculopathy, a cervical fusion in C5–C6, shoulder impingement syndrome (left shoulder debrided and decompressed), shoulder bursitis, lumbar DDD with radiculopathy following the May 2012 car accident, headaches, and degenerative arthritis. (R. 1014.) Dr. Sotos moderated Plaintiff's physical limitations as compared to his first medical opinion; he alleged Plaintiff could stand or walk less than one hour and sit for two hours in an eight-hour work day. (R. 1014.) According to his second medical opinion, Plaintiff could occasionally reach overhead and reach in other directions with both arms, often handle and finger with each hand, occasionally push or pull with either arm, and even climb on occasion. (R. 1015.) Dr. Sotos did not opine on whether Plaintiff could use foot controls, whether she needs additional breaks beyond the norm, or how many "bad days" per month her symptoms are heightened (he wrote "don't know"). (R. 1015.) He concluded by attesting to the continuing accuracy of his opinion as to Plaintiff's capabilities. (R. 1015.) Dr. Sotos again did not explain the reasoning behind his conclusions. (R. 1014–15.)

In reviewing a disability claim, in addition to considering the medical and vocational evidence, the Commissioner must consider subjective symptoms. Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974). As the court stated in Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971):

> Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.

In Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975), the court stated:

> Bittel seeks to help those claimants with cases that so often fall within the spirit—but not the letter—of the Act. That plaintiff did not satisfy the factfinder in this regard, so long as proper criteria were used, is not for us to question.

The applicable regulations require more explicit findings concerning the various vocational facts which the Act requires to be considered in making findings of disability. The regulations, published at 20 C.F.R. §§ 404.1501, et seq., set forth an orderly and logical sequential process for evaluating all disability claims. In this sequence, the ALJ must first decide whether Plaintiff is engaging in substantial gainful activity. If not, then the severity of her impairments must be considered. If the impairments are severe, then it must be determined whether she meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairments do not meet or equal the Listings, then it must be ascertained whether she can do her past relevant work. If not, then her RFC must be ascertained, considering all the medical evidence in the file. The finding of RFC is the key to the remainder of findings, including whether Plaintiff can resume any past relevant work. If not, the ALJ must assess whether Plaintiff can perform any work corresponding with her RFC in the national economy. At that stage, the Commissioner has a burden going forward to provide evidence of jobs in the national economy that would be suitable for Plaintiff.

Using the above five-step method, the ALJ evaluated Plaintiff's DIB claim. She first concluded that Plaintiff did not engage in substantial gainful activity between the alleged disability onset date of July 30, 2011 through December 31, 2012, her date last insured. (R. 15.) Second, she determined that Plaintiff suffered from the following severe impairments through the date last insured: "cervical degenerative disc disease status post cervical fusion; lumbar degenerative disc disease; degenerative joint disease of the left shoulder, right foot, and right ankle; and depression." (R. 15.) Third, up to the date last insured, Plaintiff's impairments or

combination of impairments did not meet or medically equal the severity of a listed impairment. (R. 16.) The ALJ next determined Plaintiff's RFC:

> [t]he claimant . . . [can] perform light work as defined in 20 CFR 404.1567(b) except after standing or walking for one hour she should have the ability to sit for 1-2 minutes, but can remain on task regardless of posture. She can occasionally reach overhead with the left, non-dominant upper extremity; can frequently reach with the right upper extremity; can frequently reach in other directions with the bilateral upper extremities; can perform frequent handling, fingering, and feeling with the bilateral upper extremities; she can occasionally stoop, kneel, crouch, and climb ramps and stairs; but never crawl or climb ladders, ropes, and scaffolds; she can have no exposure to unprotected heights and unprotected moving mechanical parts; and she should have no concentrated exposure to extreme cold or vibration. The claimant is able to perform simple, routine tasks with few, if any, workplace changes, meaning the same duties are performed at the same station/location from day to day.

(R. 17.)

In her decision, the ALJ reiterated Plaintiff's testimony that pain in her neck and back, shoulder and foot problems, and depression prevented her from working. (R. 18.) Despite surgeries on her neck and left shoulder, Plaintiff continued to have joint pain and had trouble turning her head. (R. 18.) She also emphasized that a May 2012 car accident worsened her back pain. (R. 18.) The ALJ recognized that Plaintiff's medically determinable impairments could be reasonably expected to cause some of her symptoms but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 18.)

The ALJ pointed to Plaintiff's medical records demonstrating successful medical interventions, mild to moderate health issues, and conservative treatment plans. Two months after Dr. Wecht performed Plaintiff's C5–C6 discectomy, Plaintiff reported that pain in her neck did not radiate into her left arm, her left arm range of motion improved, and her overall left-arm

pain decreased. (R. 18, 519.) Dr. Wecht confirmed at Plaintiff's two-month-post-operative exam that Plaintiff had an excellent range of motion in her left arm and walked with a normal gait. (R. 18, 519.) After Plaintiff's May 2012 car accident, Dr. Sotos examined her cervical spine many times, with mild cervical range-of-motion limitations being Plaintiff's most serious limitation. (R. 18, 585–98.) A July 18, 2012 MRI of Plaintiff's cervical spine showed a mild disk bulge at C6–C7 with a stable C5–C6 fusion in place; the MRI did not detect stenosis or neural foraminal narrowing. (R. 18, 486.) Dr. Wecht evaluated Plaintiff on August 29, 2012, noting that her gait, strength, sensation, and reflexes were normal. (R. 18, 512.)

Plaintiff's left shoulder was the ALJ's next subject. Dr. Goitz performed surgery on Plaintiff's left shoulder at the end of February 2012. (R. 19, 244.) While Plaintiff reported some continuing pain six weeks after her left shoulder surgery, the shoulder had almost a full range of motion with just mild tenderness. (R. 19, 273–74.) Dr. Goitz advised continued physical therapy and prescribed a muscle relaxer. (R. 19, 273–74.)

The ALJ also evaluated Plaintiff's lumbar spine issues. Dr. Goitz examined her after the May 2012 car accident and prescribed a muscle relaxer for Plaintiff's pain; her gait and strength appeared normal though she reported leg numbness. (R. 19, 597–98.) A July 25, 2012 MRI showed a mild L4–L5 bulge with mild foraminal protrusion at the L4–L5 level but otherwise showed only mild degenerative changes. (R. 19, 712–13.) Dr. Wecht evaluated Plaintiff's low back on August 29, 2012 and concluded that surgery was not needed, though he did advise that she perform strengthening exercises. (R. 19, 512.) Dr. Sotos ordered an electromyography for Plaintiff on October 23, 2012, which showed "minimally abnormal" results. (R. 19, 502–03.)

Evaluating Dr. Sotos's 2015 medical opinions, the ALJ gave them little weight. She reasoned that "they were prepared long after the claimant's date last insured, do not specifically

13

relate back, and do not reflect the claimant's abilities prior to December 31, 2012." (R. 20.) Dr. Sotos wrote his 2015 medical opinions on Plaintiff two months apart, which rendered them "less persuasive" because they expressed different physical limitations. (R. 20.)

In the fourth step for determining whether Plaintiff is disabled, the ALJ found that Plaintiff had past relevant work as a nurse. (R. 21.) Plaintiff's nurse jobs required a medium through heavy exertional level, which is more exertion than Plaintiff's RFC (light work) allows. (R. 17, 21.) Moving to step five, the ALJ determined that Plaintiff could work in the national economy as a laundry folder, photo copy machine operator, or laundry sorter. (R. 22.) The ALJ concluded that Plaintiff was not disabled. (R. 22.)

### III. Discussion

Plaintiff's appeal hinges on whether the ALJ properly gave little weight to Dr. Sotos's medical opinions, as this decision led to an RFC assessment that did not preclude Plaintiff's employment in the national economy. District courts must review SSA determinations keeping several principles in mind. "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011); 20 C.F.R. § 416.927(d)(1–2). It is the ALJ's obligation to weigh the medical record and choose between conflicting accounts; district courts must defer to the ALJ's findings of fact that are supported by substantial evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992). "[T]he opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Brown v. Astrue, 649 F.3d 193, 196 n.2 (3d Cir. 2011). "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429 (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1984)). But ALJs

"cannot reject evidence for no reason or the wrong reason." Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981). Nor may reviewing courts affirm the Commissioner's decision denying a Social Security disability claim on a ground not relied upon by the Commissioner. Fargnoli v. Halter, 247 F.3d 34, 44 n.7 (3d Cir. 2001).

The ALJ considered Dr. Sotos's medical opinions regarding Plaintiff's physical capacity to work (R. 971–72, 1014–15) but ascribed them little weight. (R. 20.) It follows that the ALJ did not give Dr. Sotos's medical opinions controlling weight. When an ALJ does not give controlling weight to a treating physician's opinion, SSA regulations provide a factor test for ALJs to follow when weighing that medical opinion. 20 C.F.R. § 416.927(c). These factors are: (1) examining relationship; (2) treatment relationship; (i) length of the treatment relationship and frequency of examination; (ii) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. Id. Although the ALJ did not explicitly spell out all of these factors in her decision, it contains enough detail for this Court to meaningfully review it. See Laverde v. Colvin, No. 14-1242, 2015 WL 5559984, at *6 n.3 (W.D. Pa. Sept. 21, 2015) (dismissing the notion that an ALJ needs to "explicitly list" and discuss factors in a regulation and instead requiring that an ALJ explain his evaluation of the medical evidence for the district court to meaningfully review whether his reasoning accords with the regulation's standards).

The ALJ acknowledged that Dr. Sotos personally examined and treated Plaintiff's shoulder and lumbar pain, thus addressing the first two Section 416.927(c) factors. (R. 19) More specifically under factor two, which measures the treatment relationship, the ALJ cited medical records detailing Plaintiff's appointments with Dr. Sotos from December 2011 through early 2013. (R. 19.) These medical records depicted Dr. Sotos evaluating Plaintiff's pain,

15

prescribing medications, and ordering medical testing. (R. 502–03, 585–98.) The ALJ referred to Dr. Sotos as "an orthopedist," thus acknowledging that Dr. Sotos is a specialist. (R. 19.)

While three Section 416.927(c) factors (examining relationship, treating relationship, and specialization) favor Dr. Sotos's medical opinions, the supportability and consistency factors (factors three and four under 20 C.F.R. § 416.927(c)) negatively outweigh them. The ALJ doubted the supportability of Dr. Sotos's medical opinions because "they were prepared long after the claimant's date last insured, do not specifically relate back, and do not reflect the claimant's abilities prior to December 31, 2012." (R. 20.)

Dr. Sotos's first opinion, dated January 5, 2015, evaluated Plaintiff's ability to work as of December 2012. (R. 971–72.) He wrote that Plaintiff could, during an eight-hour work day, stand or walk for less than an hour and sit for less than an hour, repeatedly lift between zero and five pounds, never reach overhead with either arm, reach "all other" with either arm, handle with either hand, finger with either hand, push and pull with either arm, squat, crawl, or climb. (R. 971–72.) Dr. Sotos stated that Plaintiff is "currently and permanently disabled" without specifically referring back to the relevant period of late July 2011 through the end of 2012 or providing any support for his conclusions on this checkbox-like form. (R. 971–72.)

Evaluating the consistency of Dr. Sotos's medical opinions, the ALJ noted that they were written just months apart in 2015 yet contained different limitations. (R. 20.) The evidence confirms this observation, as Dr. Sotos's second medical opinion (referring to Plaintiff's ability to work back to August 2011) moderated Plaintiff's physical limitations as compared to his first medical opinion; he alleged Plaintiff could stand or walk less than one hour and sit for two hours in an eight hour work day. (R. 1014.) Dr. Sotos also indicated that Plaintiff could occasionally reach overhead and reach in other directions with both arms, often handle and finger with each

16

hand, occasionally push or pull with either arm, and even climb sometimes. (R. 1015.) As opposed to his first 2015 medical opinion, Dr. Sotos did not conclude whether Plaintiff was disabled. (R. 1014–15.) The ALJ's decision ascribing little weight to Dr. Sotos's medical opinions due to their low supportability and consistency is proper under 20 C.F.R. § 416.927(c).

Plaintiff's medical record, as cited by the ALJ, does not reflect the physical limitations alleged in Dr. Sotos's medical opinions—especially his first one. Beginning with Plaintiff's left shoulder, it had continuing pain six weeks after Dr. Goitz performed surgery on it in February 2012. (R. 19, 273–74.) Plaintiff's left shoulder also had nearly a full range of motion with mild tenderness. (R. 19, 273–74.) Dr. Goitz recommended conservatively treating the shoulder pain with physical therapy and a prescription muscle relaxant. (R. 19, 273–74.) As for Plaintiff's neck, her records show that mild cervical range-of-motion limitations with a mild cervical disk bulge at C6–C7 occurred after her May 2012 car accident. (R. 18, 486, 585–98.) Dr. Wecht noted in late August 2012 that Plaintiff's gait, strength, sensation, and reflexes were normal. (R. 18, 512.) Concluding with Plaintiff's lumbar spine, Dr. Goitz examined it after the May 2012 car accident and prescribed a muscle relaxer for Plaintiff's pain; her gait and strength appeared normal though she reported leg numbness. (R. 19, 597–98.) A July 25, 2012 MRI showed a mild L4–L5 bulge with mild foraminal protrusion at the L4–L5 level but otherwise showed only mild degenerative changes. (R. 19, 712–13.) Dr. Wecht evaluated Plaintiff's lower back on August 29, 2012 and concluded that surgery was not needed, though he did advise her to perform strengthening exercises. (R. 19, 512.) Dr. Sotos ordered an electromyography for Plaintiff on October 23, 2012, which showed "minimally abnormal" results. (R. 19, 502–03.) A reasonable mind could support the ALJ's conclusion that Dr. Sotos's medical opinions deserve

little weight because his conclusions are not supported by the record evidence. Richardson, 402 U.S. at 401; see supra pp. 7–10.

Since the ALJ gave little weight to Dr. Sotos's medical opinions via the 20 C.F.R. § 416.927(c) factors, she had a permissible basis for formulating Plaintiff's RFC without the disabling or near-disabling limitations Dr. Sotos alleged. After all, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Brown, 649 F.3d at 196 n.2. Using the ALJ's legally adequate RFC determination,[2] the VE opined that Plaintiff could work as a laundry folder, photo copy machine operator, or laundry sorter. (R. 22.) Thus, substantial evidence supports the ALJ's holding that Plaintiff is not disabled. (R. 22.)

## IV. Conclusion

Plaintiff's motion for summary judgment (Docket No. 14) will be denied, the Commissioner's motion for summary judgment (Docket No. 19) will be granted, and the Commissioner's decision that Plaintiff is not disabled will be affirmed. (R. 1, 22.)

Dated: August 28, 2017         /s/ Robert C. Mitchell
                               ROBERT C. MITCHELL
                               United States Magistrate Judge

cc:   All counsel of record

---

[2] Plaintiff did not challenge the Commissioner's decision on any basis other than whether the ALJ properly ascribed little weight to Dr. Sotos's medical opinion. Nor did the Court observe a reason to remand or reverse the Commissioner's decision.